**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330990)
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (305) 975-3320
scott@edelsberglaw.com

*Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND MIRZAYAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| MY TECHNOLOGY, INC., d/b/a MYPRIZE.US, | |
| Defendant. | |

Plaintiff Raymond Mirzayan ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant My Technology, Inc., d/b/a MyPrize.US ("Defendant" or "My Prize"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

## NATURE OF THE CASE

1.      This case arises out of Defendant's operation of an illegal online casino in violation of California law.

2.      Defendant owns and operates one of the most popular and profitable casino and sweepstakes gaming website on the planet called MyPrize.US, available at https://www.myprize.us.

3.      In My Prize, users can access and play thousands of popular casino games, including, *inter alia*, jackpots, slots, roulette, baccarat, blackjack, poker, and scratch cards (the "Chance

1  Games"). Some of the Chance Games can even be played with real dealers in real-time.

2      4.    The Chance Games are, undoubtedly, games of chance. The Chance Games that are

3  offered on the website are gambling, and are no different than if they were played in a Las Vegas

4  casino. Their outcomes are determined primarily, if not exclusively, by randomization—rendering

5  them indistinguishable from the game found in traditional, brick-and-mortar casinos.

      5.    The trick is My Prize has branded itself as a "social casino," which is simply a title to

6  mislead regulators and consumers into believing it offers harmless gameplay instead of unlawful

7  gambling.

8      6.    In reality, My Prize players can buy chips, gamble and cash out for rewards—just like

9  at a regular casino. Indeed, My Prize owes its overwhelming success to its authentic casino gaming

10  experience, including games from a myriad of reputable gaming studios, generous bonus programs,

11  and diverse, fast-paying banking options.

12      7.    My Prize generates revenue when players make purchases for its in-game currency,

13  which are tokens that allow consumers to play the games offered on Defendant's website.

14      8.    There are two forms of currency: Gold Coins and Sweeps Cash. Gold Coins are a

15  standard in-game currency, which My Prize offers with a generous sign-up bonus and daily refills

16  ensuring ongoing access.

17      9.    My Prize claims that its Gold Coins are recreational play that have no real-world value.

18  But what it does not tell its customers is that it bundles the Gold Coins offer with Sweeps Cash, which

19  is another form of currency with monetary value.[1] This is the true nature of its business model.

20      10.    To participate in sweepstakes games with the potential to win real prizes, players use

21  Sweeps Cash. After fulfilling a 1x playthrough requirement and accumulating a minimum of 100

22  Sweeps Cash, players can redeem them for cash prizes only through the USDC on Ethereum payment

23  method. In short, a user playing games using Sweeps Cash is gambling in the purest sense—they are

24  wagering something of value (Sweeps Cash) on a random event with the hope and intent of winning

---

26  [1] According to player reviews, My Prize's most enticing feature is its bonus bundle options and reward
27  program. https://www.dimers.com/sweepstakes-casinos/myprize-us (last visited August 20, 2025).
     Upon registration, new users automatically receive 1,000 Gold Coins and 1 Sweeps Cash.
28  https://next.io/sweepstakes-casinos-us/myprize-us/ (last visited August 20, 2025).

1    more Sweeps Cash than wagered to then redeem for cash and monetary prizes.

2        11.    Defendant's pricing structure confirms that the true purpose of these transactions is to

3    sell Sweeps Cash. Notwithstanding the differences between the coins, none of the games depend on

4    any amount of skill to determine their outcome.

5        12.    Virtual gambling is highly addictive and strictly regulated in California. By law, these

6    games can only be offered by licensed operators in licensed, physical locations. Defendant's

7    operations flout these legal requirements by providing unlicensed gambling services to California

8    residents via its games.

9        13.    Plaintiff, individually and on behalf of all other similarly situated, seeks damages,

10   restitution, declaratory, and injunctive relief.

## PARTIES

11       14.    At all times material hereto, Plaintiff Raymond Mirzayan has been a resident of San

12   Francisco, California.

13       15.    Defendant My Technology Inc. is a company formed in Delaware and with its

14   headquarters at 382 NE 191st St., Miami, FL 33179. Defendant owns and operates a gambling website

15   (available at https://www.myprize.us). Defendant conducts business within the venue of this District

16   and throughout California generally, which website and operations are not permitted and are illegal

17   under California law.

## JURISDICTION AND VENUE

18       16.    This Court has jurisdiction over this action under the Class Action Fairness Act of

19   2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the

20   amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the

21   proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at

22   least one plaintiff and one defendant.

23       17.    This Court has personal jurisdiction over Defendant because it conducts substantial

24   business and directs its activities into this District, including activities that form the basis for the

25   claims here, and a substantial part of the acts and omissions complained of occurred in this District.

26       18.    Moreover, Defendant actively disseminates targeted advertisements within the state

27   with the intent of promoting and selling its products and services to consumers there. As such,

28

Defendant does business with sufficient minimum contacts in California.

19.    Defendant has purposefully directed its activities toward this District.

20.    Defendant has purposefully availed itself of the privileges of conducting activities in this District.

21.    Defendant's claim arises out and relates to Defendant's forum-related activities.

22.    The exercise of jurisdiction over Defendant is reasonable.

23.    Upon information and belief, Defendant localizes its game for each market where it is distributed, including the United States.

24.    Upon information and belief, Defendant has sold millions of dollars of virtual items to thousands of California residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

25.    My Prize facilitates ongoing economic activity between thousands of California players and Defendant.

26.    Upon information and belief, Defendant directly controls whether consumers in California can complete purchases from My Prize.

27.    Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from California.

28.    Upon information and belief, Defendant has the capability to prevent California residents from completing purchases or placing wagers in My Prize but has chosen to accept those purchases and wagers from California residents. For example, other gambling websites prevent transactions from residents of states where gambling is unlawful.

29.    Upon information and belief, Defendant has taken no steps to restrict California residents' access to My Prize or to restrict the ability of California residents to make purchases from My Prize.

30.    Defendant aggressively advertises My Prize in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

31.    Upon information and belief, these advertisements for My Prize were designed and

CLASS ACTION COMPLAINT

directed to attract consumers in the United States, including this District, to play My Prize.

32.    Upon information and belief, Defendant has the capability of targeting its My Prize advertisements by geography and the capability of excluding residents of California from the reach of Defendant's advertisements for My Prize.

33.    Upon information and belief, Defendant partners with Meta Platforms, Inc., headquartered in California, to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in My Prize, including residents of California. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in California.

34.    Upon information and belief, Defendant has taken no steps to restrict its advertisements for My Prize from reaching residents of California.

35.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in My Prize occurred in this District.

36.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1) and § 1391(b)(3), in that Defendant is subject to this Court's personal jurisdiction.

37.    Plaintiff alleges, upon information and belief, that Defendant conducts professional and commercial activities in California on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

38.    Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within California, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

## DIVISIONAL ASSIGNMENT

39.    Pursuant to Local Rules 3-2(c) and 3-5(b), Plaintiff Mirzayan further states that assignment to the San Francisco and Oakland Division of this Court is proper because Plaintiff resides

in San Francisco County, and many of the events at issues in this lawsuit occurred in San Francisco County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.    *The Problem of Online Gambling*

40.    Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

41.    Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[2] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[3]

42.    Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[4] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[5]

43.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[6]

44.    Further, internet searches for help with gambling addiction, such as "am I addicted to

_____

[2]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed July 29, 2025).

[3] *See id.*

[4]      https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed July 29, 2025).

[5]https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed July 29, 2025).

[6]https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed July 29, 2025).

CLASS ACTION COMPLAINT

1   gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024.

2   This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking

3   nationally, with 180,000 monthly searches at its peak.[7]

4       45.     The surge in gambling addiction is particularly pronounced among young men, with

5   10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general

6   population.[8] Online platforms, including social casinos, have been identified as significant

7   contributors to this trend. These platforms often employ addictive design features, such as near-miss

8   outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

9       46.     The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect

10  that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing

11  prevalence of gambling addiction, funding for treatment remains insufficient.

12      47.     In California, it is illegal to operate and offer online gambling casinos, including, like

13  here, websites that offer slot machines, blackjacks, roulette, and poker. *See generally* Cal. Penal Code

14  §§ 330 *et. seq.* In this regard, California has a fundamental and deep-rooted public policy against

15  gambling.

        **II.    *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.***

16      48.     My Prize advertises itself as a "social casino" that is "ALWAYS FREE" and "free to

17  play" to avoid gambling regulations and reassure potential players that it offers casino-style games

18  purely for entertainment, without real-money stakes. This false representation misleads consumers,

19  including Plaintiff, into believing that they are participating in harmless gameplay rather than actual-

20  money gambling, even when wagering with Sweeps Cash. In doing so, Defendant enables users to

21  engage in real-money gambling through its system of Sweeps Cash, deceiving consumers into

22  believing they are participating in harmless gameplay when, in fact, they are wagering something of

23  value for the chance to win tangible prizes.

24

25  _____

26  [7]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_  (last accessed July 29, 2025).

27  [8]https://apnews.com/article/sports-betting-compulsive-gambling-addiction-
28  d4d0b7a8465e5be0b451b115cab0fb15 (last accessed July 29, 2025).

CLASS ACTION COMPLAINT

49. The website offers a multitude of digital slot machines, blackjack, poker, roulette and other forms of lottery wheel. Through My Prize, Defendant offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Sweeps Cash.

50. Players can access My Prize through the internet website.

51. Once a player creates a My Prize account, they receive a welcome bonus that ranges from 4,000 to 11,000 Gold Coins and .6-1.6 Sweeps Cash and can choose to either wager Gold Coins or with Sweeps Cash. In the screenshot below, the welcome bonus was 8,000 Gold Coins and 1 Sweeps Cash.



52. When players log onto the website, they are met with rows of games to choose from, including slots, roulette, poker, and blackjacks.



53. In addition to its catalog of virtual games, Defendant further enhances the realism of its platform by offering "Live Dealer Games." These games are advertised as allowing players to "interact with human dealers" and to "experience what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device."

54. In these Live Dealer Games, players wager Sweeps Cash, interact with dealers and other participants via live chat, and observe real-time video streams of human dealers managing casino activities such as card dealing and roulette spins. The immersive and lifelike nature of these

1  features intensifies the gambling experience, making it virtually indistinguishable from participating

2  in a traditional, brick-and-mortar casino.

3      55.    Before playing a game, players must select their play mode (either Gold Coins or

4  Sweeps Cash) by clicking the option in the top-center menu of the website.



16      56.    Once a mode is selected, games allow players to wager the corresponding type of coin.

17  Depending on the outcome of the spin or play, a player may earn more coins. Defendant makes it easy

18  to switch between wagering the two Coins. This simple mechanism is designed to make it as

19  convenient as possible for players to transition to gambling with real-world stakes. Players who start

20  out having fun can quickly and effortlessly shift to risking actual money without fully appreciating

21  the financial consequences.



57.    In short, the slots, blackjack, and other games of chance offered on the website are gambling, and they are no different than if they were played in a Las Vegas casino.

58.    The website is accessible and made available to California residents.

59.    Consumers visiting the website for the first time are awarded an allocation of free Gold Coins and Sweeps Cash.  Consumers also receive Gold Coins and Sweeps Cash through promotional giveaways and other marketing efforts such as daily rewards to entice users to keep playing and wagering on My Prize.

60.    Consumers also may use Sweeps Cash to play games. Sweeps Cash may be redeemed for cash prizes and gift cards. Upon information and belief, one Sweeps Cash is equal to $1USD in prizes. In other words, "Sweeps Cash" is a proxy for real money.

61.    Consumers can receive Sweeps Cash in multiple ways, including by purchasing specifically marked packs of Gold Coins, promotions, participating in giveaways, or completing daily missions. The most common way, however, for users to obtain Sweeps Cash is to purchase Gold Coins (*i.e.*, the more Gold Coins a user purchases, the more Sweeps Cash the user receives as a bonus).  So, in effect, when a person buys Gold Coins, they are also generally buying Sweeps Cash, though Defendant falsely markets the sale as Sweeps Cash being an added "bonus" added to the purchase. The following screenshot is taken from Defendant's in-game "store."

CLASS ACTION COMPLAINT

62.    Players then gamble using Sweeps Cash that they would play with Gold Coins.  In short, a user playing the chance-based games with Sweeps Cash is gambling in the purest sense – they are wagering something of value on a random event with the hope and intent of winning more Sweeps Cash than wagered to then receive tangible rewards and prizes that have monetary value.

63.    Plaintiff and, upon information and belief, the vast majority of players on the Defendant's platform regularly buy additional coin bundles when they run out of Sweeps Cash even when they already possess unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirm that these transactions are driven entirely by the desire to obtain Sweeps Cash for real-money gambling, rather than for the Gold Coins that Defendant sells.

64.    Users may acquire Sweeps Cash through various means, including promotional giveaways, participation in contests or daily missions, and most commonly, through the purchase of Gold Coins. The more Gold Coins a user buys, the more Sweeps Cash they receive as an alleged "free bonus." In reality, Defendant uses the sale of Gold Coins as a vehicle for the sale of Sweeps Cash,

misleadingly marketing the transaction to obscure the real-money nature of the exchange.

65.     Once obtained, users gamble with Sweeps Cash in the same manner as they do with Gold Coins. However, because Sweeps Cash are redeemable for real-world monetary value, users who wager Sweeps Cash are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

66.     Furthermore, Defendant imposes a "1x playthrough" requirement on bonus Sweeps Cash, mandating that players must wager an amount equal to the number of bonus Sweeps Cash they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Sweeps Cash, a player must first wager at least 25 Sweeps Cash on casino-style games offered through the My Prize platform. Further, before a player is permitted to redeem any Sweeps Cash they must first win a minimum of 100 Sweeps Cash. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Defendant's operations.

67.     California Penal Code § 330b(a) holds that it is "unlawful for any person to make or to permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device, or to receive any check, slug, token, or memorandum entitling the holder to receive money, credit, allowance, or other thing of value."

68.     California Penal Code 330b(d) provides: "For purposes of this section, 'slot machine or device' means a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other

means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device[.]"

69.    California broadly defines "thing of value" as "any money, coin, currency, check, chip, allowance, token, credit, merchandise, property, or any representative of value." Cal. Penal Code, § 330.2.

70.    Players of My Prize stake or risk something of value when playing any of the games of chance offered on Defendant's website. Specifically, players use Sweeps Cash to play various casino-style games, many of which are determined predominantly by chance rather than skill. When Sweeps Cash are used, players risk this currency for the opportunity to win additional Sweeps Cash, which can ultimately be redeemed for cash-value prizes. If a player wins, they retain and often multiply the Sweeps Cash they staked; if they lose, those Sweeps Cash are forfeited. This distinguishes My Prize from traditional video games, where a user expends in-game currency or tokens to play regardless of the outcome. In My Prize, players either maintain and grow their balance, or lose it, based on the results of chance-based games, closely resembling the mechanics of real-money gambling.

71.    While My Prize's games require some level of user interaction, chance is the predominant factor in determining outcomes. Specifically, in slot machines and other casino-style games featured on the site, the results are driven by random number generators or other chance-based mechanics. Upon information and belief, these outcomes are not influenced by player skill or strategy, but instead by algorithms designed to introduce randomness. As a result, the element of chance materially impacts the result of each game.

72.    The slight degree of user interaction does not remove My Prize's games from the definition of games of "chance" or "contest of chance" under California law. Numerous games widely recognized as gambling, such as blackjack and craps, involve user interaction. User interaction is also a known feature in real-world slot machines. My Prize is akin to real world casino games known as "I-Slots" or interactive slots, which are recognized forms of gambling that allows players to influence

the outcome through choices and gameplay.[9]

73.    Even players with extensive experience or knowledge of casino-style games may lose repeatedly if the game's underlying randomization is not in their favor. Conversely, less experienced users may win when the randomized outcomes align advantageously. This inherent unpredictability reinforces that chance, rather than skill, is the dominant factor in the outcome of My Prize's games.

74.    The Gold Coins and Sweeps Cash in My Prize are things of value, because they provide an "extension of a service, entertainment or a privilege of playing a game or scheme without charge" and are considered "any representative of value" to players. Further, Sweeps Cash are prizes that can be cashed out for real-world monetary value to be spent elsewhere – i.e., "things of value."

75.    The games in My Prize have all the same trappings as casino games, such as slot machines, including graphics and sounds.

### III.    *Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s*

76.    In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

77.    Most state gambling statutes define gambling as involving three core elements: (1) consideration, (2) chance, and (3) a prize. Operators of these Internet cafés attempted to sidestep the

---

[9] BetMGM, *Slots and the World of Narrative Gaming*,https://casino.betmgm.com/en/blog/islots-narrative-gaming/ (last accessed January 25, 2025); SDLC Corp., *How Slot Games Are Incorporating Interactive Features and Mini-Games*; https://sdlccorp.com/post/how-slot-games-are-incorporating-interactive-features-and-mini-games/ (last visited Dec. 31, 2024); https://lcb.org/articles/i-slots (last accessed January 25, 2025); Casino Life, *The Different Types of Online Slots & Their Features*; https://www.casinolifemagazine.com/blog/different-types-online-slots-theirfeatures#:~:text=I%2DSlots%2C%20or%20interactive%20slots,outcome%20through%20choices%20and%20gameplay (last accessed January 25, 2025).

"consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by brands like large brands. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

78.     Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

79.     In *Barber v. Jefferson Cty. Racing Ass'n, Inc.*, 960 So.2d 599 (Ala. 2006), the Alabama Supreme Court dealt a decisive blow to the Internet café defense. There, operators sold internet time while offering customers 100 "sweepstakes entries" for every dollar spent. They argued that the entries were not gambling because customers were buying a product (internet time), and had the option to request free entries by mail. The court rejected these arguments, holding that the operation constituted illegal gambling despite these superficial distinctions. See *id.* at 612.

80.     *Barber* reflects a broad consensus among courts nationwide: the use of nominal product sales or alternative free-entry routes does not shield operators from liability when the dominant purpose of the enterprise is gambling. The underlying structure—consideration exchanged for a chance to win a prize through a game of chance—remains unchanged and unlawful.

81.     Defendant now attempts to revive this discredited model. Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

82.     As detailed below, Defendant employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Sweeps Cash"—with real-world value—for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

83.     Indeed, in *Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024), a federal court granted summary judgment against an online gaming operator whose structure mirrored Defendant's.

84.     Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is

part of a familiar pattern already discredited by courts, regulators, and the public. Defendant's operations are not novel—they are a modern replica of a failed and unlawful model.

**IV.    *All Purported Contracts With Defendant Are Void***

85.    There are two separate and independent reasons why any purported contract with Defendant is void.

86.    First**,** under California law, a contract is not lawful if it is "[c]ontrary to an express provision of law," or "[o]therwise contrary to good morals." Cal. Civ. Code § 1667. Contracts that involve illegal gambling fall squarely within the ambit of this rule. Courts have consistently recognized that agreements formed in connection with unlawful gambling activities are void and unenforceable as a matter of public policy.

87.    Parties cannot lawfully agree to engage in gambling any more than they can lawfully agree by contract to engage in forced labor, sex trafficking, illicit drug sales, or other crimes.

88.    Second, operating a business without a license or registration can result in serious consequences in any state. California has one of the toughest sanctions for conducting business in California without necessary registration or licensing with the Secretary of State.

89.    In addition to costly penalties and fees, California authorizes the automatic voiding of any contracts a company entered into during the period it was out-of-compliance either with the secretary of state or with the California Franchise Tax Board (FTB). Cal. Rev. & T. Code §§ 23304.1.

90.    Specifically, § 23304.1 provides that any contract entered into by a corporation that is not qualified to do business in California, or that is suspended by the FTB, is voidable at the request of any party to the contract other than the noncompliant entity. Thus, any agreements Defendant entered into while unregistered, unlicensed, or suspended under California law are voidable at Plaintiff's election.

91.    Accordingly, Plaintiff hereby voids any purported agreement or contract between himself and Defendant. As a result, Defendant may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

**FACTS SPECIFIC TO PLAINTIFF**

***Plaintiff Raymond Mirzayan's Experience***

92.    Plaintiff Mirzayan played My Prize from approximately January 2025 to July 2025 during which he made many in-game purchases of Sweeps Cash.

93.    Plaintiff Mirzayan accessed My Prize from his residence in California. Mirzayan received an initial allotment of Gold Coins and Sweeps Cash. After losing his initial allocation of free Gold Coins and Sweeps Cash, he began purchasing Sweeps Cash from Defendant and did so from California, which Defendant accepted.

94.    Plaintiff Mirzayan placed all of his wagers in My Prize in California.

95.    Overall, Plaintiff Mirzayan wagered and lost approximately $500.00 in real-world currency while using My Prize and its games of chance, including slots and jackpot. He lost the Sweeps Cash he purchased from Defendant by wagering them in My Prize's games of chance.

96.    By and through My Prize's gambling features described above during the time period of approximately January 2025 to July 2025, Mirzayan was induced into making certain in-game purchases and wagers that he otherwise would not have made.

97.    As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

98.    Plaintiff Mirzayan enjoys playing online games and has an ongoing interest in playing My Prize if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff Mirzayan therefore has an ongoing interest in My Prize complying with state and federal gambling laws and consumer protection statutes.

## CLASS ALLEGATIONS

99.    Plaintiff brings this case as a class action pursuant to Fed. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

100.    The Class is defined as follows:

All California residents who, during the applicable limitations period, played and lost money wagering on Defendant's online casino games.

101.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

102.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

     a.  Whether the games in My Prize are gambling as defined under California law;

     b.  Whether Defendant engaged in the conduct alleged in the Complaint;

     c.  Whether Defendant violates the statutes listed below in Counts I and II;

     d.  Whether Defendant violated statutes analogous to those alleged herein applicable;

     e.  Whether and how Defendant manipulates the odds in games offered in My Prize;

     f.  Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

     g.  Whether Plaintiff and the other Class members are entitled to restitution or other relief.

103.    **Typicality.** Plaintiff's claims are typical of the claims of the Class because they were players of My Prize who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

104.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

105.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency

and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

106.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**

**Unlawful & Unfair Business Practices in Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On behalf of Plaintiff Mirzayan and the Class)**

107.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–106 by reference as if fully set forth herein.

108.    Plaintiff and Defendant are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

109.    Plaintiff has standing under the UCL because he suffered an injury in fact and lost money or property as a result of Defendant's unlawful and unfair conduct.

110.    By hosting and facilitating the unlawful online gambling website at issue here, Defendant engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful and unfair business acts and practices.

111.    Slot machines have long been outlawed in California, as are other games of chance offered on Defendant's website, such as blackjack, poker, and roulette.

112.    If a gaming machine has the look and feel of a slot machine or other gambling game, accepts real money for gameplay, and rewards a win with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine or gambling.

113.    Moreover, any legitimately operated casino must randomize its results, but social casinos do not randomize their results, at least with respect to the electronic forms of gambling offered on the website.  Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues).

114.    As a result, Defendant cheats players out of a legitimately randomized gaming experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate (*i.e.*, licensed and regulated) slot machine.

115.    The UCL prohibits acts of "unfair competition." As used in this section, "unfair competition" encompasses three distinct types of misconduct: (a) "unlawful…business acts or practices"; (b) "unfair fraudulent business acts or practices"; (c) "unfair, deceptive or misleading advertising," and (d) "any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

116.    Defendant's conduct as alleged herein occurred in the course of trade or commerce.

117.    As described herein, Defendant committed unlawful and unfair business acts or practices in violation of the UCL.

118.    As a result of engaging in the conduct alleged in this Complaint, Defendant has also violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, *inter alia*, the following laws:

    a.  **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. My Prize constitutes a "gambling" because it is a game of "chance, including any gambling device…played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." Cal. Penal Code § 337j(1). Defendant has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

b.  **California Penal Code § 330a**: Section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Defendant violates this section as described above.

c.  **California Penal Code § 330b**: Section 330b declares that "[i]t is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." As alleged, Defendant permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code § 330b(d). The software for My Prize is an apparatus alone. Moreover, the game operating together with Defendant's servers are a machine, apparatus or device. The software for the game also modifies mobile phone devices into gambling devices as defined by Penal Code § 330b(d). Further, a user's mobile device is adapted by the game to create a slot machine or device. Users play the game and purchase

coins from the games through hardware features of the mobile devices on which the game operates.

d. **California Penal Code § 337j(a)(1)**: Defendant violates Cal. Penal Code § 337j(a)(1) by "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed gambling in the state.

e. **California Penal Code § 337j(a)(2)**: Defendant violates Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game."

f. **The Illegal Gambling Business Act of 1970 (18 U.S.C. § 1955) (the "IGBA"):** The IGBA declares it a crime to "conduct, finance, manage, supervise, direct, or own all of part" of an illegal gambling business. Defendant violates the IGBA because its business involves five or more persons, has been in continuous operation for more than thirty days, and violates California's gambling laws as alleged herein. By managing, directing, or controlling all or part of the conduct alleged herein with respect to its sale of virtual currency (in the form of coins) Defendant violates 18 U.S.C. § 1955.

g. **The Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367) (the "UIGEA"):** The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly accept payments "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5633. "Unlawful Internet gambling" is placing, receiving or transmitting a bet or wager through, at least in part, the Internet where such bet or wager "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 15 U.S.C. § 5362(10)(a). By accepting payment from consumers in exchange for virtual currency used wager Defendant's game of chance, My Prize, Defendant has violated the UIGEA.

119.    The Chance Games are also illegal lotteries as defined by Cal. Penal Code § 319. Section 319 defines a lottery as any "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Thus, the elements of an illegal lottery under Section 319 are a prize (or "property"), distribution by chance, and consideration.

120.    Defendant's conduct described herein is also unlawful and unfair under the UCL because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers as Defendant offers illegal online gambling games.

121.    Through its unfair and deceptive acts and practices, Defendant improperly obtained money from Plaintiff and members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, and to enjoin them from continuing to violate the UCL. Otherwise, Plaintiff and members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. Accordingly, Plaintiff and the Class lack an adequate remedy at law. Moreover, Plaintiff asserts this cause of action in the alternative to its claims for damages below.

122.    As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff and other members of Class suffered  an injury in fact and/or lost money and property as described above.

123.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff Mirzayan seeks an injunction on behalf of the general public enjoining Defendant from continuing to engage in the conduct described above as Defendant's wrongful conduct is ongoing.

124.    Plaintiff Mirzayan also seeks rescission and an order requiring Defendant to make  full restitution and to disgorge its ill-gotten gains wrongfully obtained from members of the California Class as permitted by Bus. & Prof. Code § 17203.

125.    Additionally, Plaintiff Mirzayan  and the California Class members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

## SECOND CAUSE OF ACTION
### Violation of CLRA, Cal. Civ. Code § 17500, *et seq*.
### (On behalf of Plaintiff Mirzayan and the Class)

126.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–106 by reference as if fully set forth herein.

127.    Plaintiff brings this cause of action on behalf of himself and the Class.

128.    In light of the CLRA's underlying purpose to protect consumers and the liberal construction with which courts should interpret it, Plaintiff's purchase of in-game Defendant's product and in-game currency in the forms of as described above falls within the definition of a "goods or service" within the meaning of Cal. Civ. Code. § 1761 and 1770.

129.    Plaintiff and each member of the proposed California Class are consumers as defined by Cal. Civ. Code. § 1761(d).

130.    Defendant's sale of coins to consumers were "transactions" within the meaning of Cal. Civ. Code. § 1761(e). Specifically, Defendant provides online gaming services. The purchase of coins is a transaction for accessing and using those services.

131.    Defendant violated, and continues to violate, the CLRA by, *inter alia*:

    a.  manipulating the odds of the games of chance in My Prize to increase their addictive qualities and to induce players to continue playing and spending more money; and

    b.  deceiving or confusing customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winning and the obligation to pay for losses), when in fact any such rights, remedies or obligations are prohibited by law.

132.    Defendant's conduct violated the following provisions of Cal. Civ. Code § 1770

    a.  "Representing that goods or services have . . . characteristics . . . that they do not have";

    b.  "Using deceptive representations . . . in connection with . . . services"; and

    c.  "Advertising goods or services with intent not to sell them as advertised."

133.    Defendant's conduct and actions are deceptive, untrue, and misleading to reasonable consumers, and will continue to mislead consumers in the future.

134.    Plaintiff and the Class relied on Defendant's advertisements, representations and/or omissions to purchase the in-game currency.

24

CLASS ACTION COMPLAINT

135.    As a direct and proximate result of Defendant's misconduct, Plaintiff and California Class members have suffered and will continue to suffer actual damages.

136.    Defendant's wrongful conduct is ongoing and presents a continuing threat to Class members.

137.    Pursuant to § 1782(a) of the CLRA, Plaintiff's counsel has notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, as proscribed by §1782, Plaintiff will move to amend her Complaint to pursue claims for actual, punitive and statutory damages, as appropriate against Defendant.  As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

### THIRD CAUSE OF ACTION
### Restitution or Unjust Enrichment
### (On behalf of Plaintiff Mirzayan and the Class)

138.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–106 by reference as if fully set forth herein.

139.    Plaintiff and the other Class members conferred an economic benefit on Defendant through their in-game purchases.

140.    Under principles of equity and good conscience, it is inequitable and unjust for Defendant to retain the monies obtained from Plaintiff and the Class, which Defendant has unjustly obtained as result of its unlawful and deceptive practices in connection with My Prize and at the expense of Plaintiff.

141.    As it stands, Defendant has retained millions of dollars in profits generated from My Prize and should not be permitted to retain those ill-gotten profits.

142.    Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

## **JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.


Dated: August 29, 2025                      Respectfully submitted,


By: /s/ Scott Edelsberg

**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (SBN 330990)
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305-975-3320
scott@edelsberglaw.com

*Counsel for Plaintiff and the Proposed Class*